# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **RUTH M. HARTER, Individually and on behalf of the heirs to CLINT HARTER, deceased,**<br><br>**and**<br><br>**JULIE NORDMAN, Individually and as heir to RANDY NORDMAN, deceased,**<br><br>      **Plaintiffs,**<br><br>      **v.**<br><br>**UNITED STATES OF AMERICA, et al.,**<br><br>      **Defendants.** | **Case No. 2:17-CV-2398-JAR-GEB** |
| **ERIC SCOTT RYERSON, by and through his Guardian-Conservator, Janice G. Wilson,**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**UNITED STATES OF AMERICA, et al.,**<br><br>      **Defendants.** | **Case No. 2:18-CV-2033-JAR-GEB** |

## MEMORANDUM AND ORDER

In March 2016, Clint Harter, Austin Harter, and Randy Nordman were murdered by Pablo Serrano-Vitorino, an undocumented alien and felon. This crime occurred after the United States Immigration and Customs Enforcement Agency ("ICE") mistakenly sent a detainer to the Johnson County Sheriff's Office in September 2015 requesting that they keep Serrano-Vitorino in their custody pending ICE taking him into their custody for an immigration violation. But ICE made a life-altering mistake. They should have sent to the detainer to Overland Park

Municipal Court ("OPMC"), which had custody of Serrano-Vitorino, not the Johnson County Sheriff's Office. Because OPMC did not receive a detainer from ICE, they released Serrano-Vitorino, and within months these three persons tragically lost their lives at the hands of Serrano-Vitorino.

Plaintiffs are the family members of the three decedents and bring these consolidated cases pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* ("FTCA") against the United States, alleging that the United States is liable for the murders based on the negligence of ICE employees.[1] Plaintiffs allege that ICE[2] failed to perform mandatory duties under federal law and acted negligently under state law in failing to detain and deport Serrano-Vitorino.

Before the Court are the United States' Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction (Docs. 13 and 23). The motions are fully briefed, the parties presented oral arguments on June 27, 2018, and the Court is prepared to rule. Whether the Court has subject matter jurisdiction under the FTCA depends upon whether ICE could be held liable under Kansas tort law in the same manner as a private person. As more fully explained below, while ICE may have made an error in executing its responsibilities under federal immigration law, the Court concludes that ICE's conduct has no private-party analog

---

[1] These cases were consolidated on March 15, 2018 upon the parties' joint request and upon a finding that they share common issues of law and fact pursuant to Fed. R. Civ. P. 42(a). Doc. 21. The Court designated *Harter*, Case No. 2:17-cv-2398-JAR-GEB, as the lead case, and directed that all future filings be made in that case. Citations to the pleadings therefore refer to the *Harter* docket, except references to pleadings filed in *Ryerson*, Case No. 2:18-cv-2033-JAR-GEB, before consolidation. Those citations include the case name in parentheses.

[2] "Department of Homeland Security, Bureau of Immigration and Customs Enforcement ('ICE') is the government's primary agency responsible for the removal and deportation of aliens who are unlawfully in the United States. 'The duties performed by ICE were previously undertaken by the Immigration and Naturalization Service ('INS') within the Department of Justice. The Homeland Security Act of 2002, Pub. L. 107296, 116 Stat. 2135, created both the U.S. Department of Homeland Security and the cabinet-level position of Secretary of Homeland Security. ICE was created under the authority of the Homeland Security Act and now ultimately reports to the Secretary [of] Homeland Security. The INS ceased to exist under [that] name in 2003 when most of its functions were transferred to the Department of Homeland Security." *United States v. Resendiz-Guevara*, 145 F. Supp. 3d 1128, 1140 n.4 (M.D. Fla. 2015) (quoting *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1169 (D. Or. 2012)).

under Kansas law because ICE did not have the requisite "special relationship" with either the decedents or with Serrano-Vitorino that would have given rise to a duty to protect third parties from harm. The Court therefore grants the United States' motions to dismiss.

## I.     Standard of Review

"Federal Courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."[3] "The party invoking federal jurisdiction bears the burden of establishing such jurisdiction as a threshold matter."[4] The United States moves to dismiss this case pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, arguing that the FTCA's waiver of sovereign immunity does not extend to Plaintiffs' claims.

Rule 12(b)(1) motions generally take two forms. First, a facial attack questions the sufficiency of the complaint's allegations as to subject matter jurisdiction.[5] "In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true."[6] Second, a factual attack goes beyond the complaint's allegations and challenges "the facts upon which subject matter jurisdiction depends."[7] When reviewing a factual attack, "a district court may not assume the truthfulness of the complaint's factual allegations."[8] Rather,

---

[3] *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir. 1994) (citations omitted).

[4] *Radil v. Sanborn W. Camps, Inc*., 384 F.3d 1220, 1224 (10th Cir. 2004) (citing *Marcus v. Kan. Dept. of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 1999); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)); *see also Saunders v. United States*, Civil Action No. 15-cv-00805-RM-CBS, 2016 WL 870011, at *2 (D. Colo. Feb. 16, 2016) (citations omitted), *adopted by Saunders v. United States*, Civil Action No. 15-cv-00805-RM-CBS, 2016 WL 865847 (D. Colo. Mar. 7, 2016).

[5] *Holt v. U.S*., 46 F.3d 1000, 1002 (10th Cir. 1995) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

[6] *Id*. (citing *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325).

[7] *Id*. at 1003 (citing *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325).

[8] *Id*. (citing *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325).

"[a] court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."[9]

"However, a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion to dismiss or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case."[10]  Under Tenth Circuit law, "[w]hen subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case,"[11] and where "the resolution of the jurisdictional question requires resolution of an aspect of the substantive claim,"[12] the jurisdictional issue and the merits are considered intertwined.[13]

The significance of converting a Rule 12(b)(1) motion into a Rule 12(b)(6) or Rule 56 motion lies not in the manner in which the court considers the motion, but in the effect of the ruling on the parties:[14]

> A dismissal under Rule 12(b)(1) is not on the merits, whereas a dismissal under either Rule 56 or Rule 12(b)(6) is on the merits. Thus, when jurisdictional questions are intertwined with the merits, courts have held that the decision on the jurisdictional question ought to operate as a decision on the merits.  That is why a Rule 12(b)(1) motion should be converted to a Rule 56 or a Rule 12(b)(6) motion when intertwining exists.[15]

---

[9] *Id*. (citing *Ohio Nat'l Life Ins. Co*., 922 F.2d at 325; *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987), *cert. denied*, 484 U.S. 986 (1987)).

[10] *Id*. (citing *Wheeler*, 825 F.2d at 259; *Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir. 1991)).

[11] *Wheeler*, 825 F.2d at 259 (citations omitted).

[12] *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000) (citing *Wheeler*, 825 F.2d at 259; 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 235 (1990)).

[13] *Id*.

[14] *Daugherty v. United States*, 212 F. Supp. 2d 1279, 1303 (N.D. Okla. 2002).

[15] *Id.* (citing *Wheeler*, 825 F.2d at 259, n.5).

The United States argues that the Court lacks subject matter jurisdiction because the FTCA does not waive the United States' sovereign immunity for claims based on ICE's failure to adhere to federal immigration statutes. The question of whether the ICE conduct at issue is governed exclusively by federal law—or whether the United States could be held liable under Kansas law in the same manner as a private person—will "require[] resolution of an aspect of the substantive claim."[16] Thus, the United States' Rule 12(b)(1) motion must be converted into a motion under either Rule 12(b)(6) or Rule 56. Although the United States has submitted a declaration in support of its motion,[17] the Court need not consider that declaration in deciding whether Plaintiffs have alleged a legal duty under Kansas tort law, and converts the United States' motion into a motion to dismiss under Rule 12(b)(6).

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level"[18] and must include "enough facts to state a claim for relief that is plausible on its face."[19] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[20] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires

---

[16] *Id.* (citing *Pringle*, 208 F.3d at 1223). The Tenth Circuit has held, "in a number of cases involving the discretionary function exception to the FTCA, that 'the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues.'" *Pringle*, 208 F.3d at 1223 (quoting *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997)); *see also Franklin Savs. Corp. v. United States*, 180 F.3d 1124, 1129 (10th Cir. 1999) (citations omitted) (stating that whether the discretionary function exception applies is a jurisdictional question intertwined with the merits); *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008) (citing *Wheeler*, 825 F.2d at 259) (same). The question of whether Plaintiffs have alleged viable claims against ICE under state tort law—which they must do establish that the FTCA's waiver of sovereign immunity applies to their claims—likewise implicates both jurisdictional and merits issues.

[17] Docs. 14-1, 24-1 (Declaration of Nathalie R. Asher, providing overview of ICE programs and priorities).

[18] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004)).

[19] *Id.* at 570.

[20] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

more than "a sheer possibility."[21]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[22]  Finally, the court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[23]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[24]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[25]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[26]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[27]

## II.    Factual Background

The following facts are alleged in Plaintiffs' Complaints and are assumed to be true for the purpose of deciding the United States' motions.  Serrano-Vitorino, an undocumented alien, first faced criminal charges in the United States in 1998.  In 2003, he was prosecuted on

---

[21] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[22] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[23] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[24] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[25] *Id.* at 678–679.

[26] *Id.* at 679.

[27] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

domestic-violence charges for an incident during which he pointed a rifle at the mother of his children. On March 23, 2003, Serrano-Vitorino was convicted of a felony and sentenced to two years in prison. He was deported after that prison term, but at some unknown time after his deportation, he re-entered the United States illegally.

In June 2014, Serrano-Vitorino was arrested again and charged with domestic battery for punching his brother in Wyandotte County, Kansas. Following that arrest, Wyandotte County officials notified ICE that Serrano-Vitorino was in custody. Plaintiffs contend that despite ICE policy requiring a face-to-face interview, no ICE official responded to the query and Wyandotte County officials had no choice but to release Serrano-Vitorino.

In November 2014, Serrano-Vitorino was arrested yet again, this time in Coffey County, Kansas for driving under the influence of alcohol, failure to produce a license, and speeding. In September 2015, he was pulled over by police in Overland Park, Kansas and cited for traffic offenses. Following that citation, "[h]e was fingerprinted at court and ICE sought to have him detained for an immigration violation."[28] Plaintiffs allege that despite

> knowing that Serrano-Vitorino was a violent offender in the country illegally, [ICE] failed to send the required paperwork to the Overland Park Police Department to keep Serrano-Vitorino in custody. Instead, ICE sent the paperwork to the wrong law enforcement agency. Once again, Serrano-Vitorino was released due to ICE's failures and omissions to perform its duties.[29]

The United States concedes that in September 2015, "ICE mistakenly sent a detainer requesting that Serrano-Vitorino be held to the Johnson County, [Kansas] Sheriff's Office, rather than to the Overland Park Municipal Court."[30] Thus, OPMC released him. Serrano-Vitorino

---

[28] Doc. 1, ¶ 8; Doc. 1, ¶ 7 (*Ryerson*).

[29] Doc. 1, ¶ 9; Doc. 1, ¶ 8 (*Ryerson*).

[30] Doc. 14 at 2; Doc. 24 at 2.

murdered Clint Harter, Austin Harter, and two others in Kansas City, Kansas on March 7, 2016, and murdered Nordman in New Florence, Missouri on March 8, 2016.

Plaintiffs are Clint Harter's widow, Ruth Harter (individually and on behalf of their two minor children); Austin Harter's father, Eric Ryerson (by and through his Guardian-Conservator, Janice Wilson); and Randy Nordman's widow, Julie Nordman.[31]  Their Complaints invoke the FTCA, and each includes one count for "General Negligence."[32]

Plaintiffs allege that ICE officers, officials, agents, and/or employees negligently, carelessly, recklessly, and/or unlawfully failed to: (1) respond to an ICE query while Serrano-Vitorino was in Wyandotte County custody in June 2014; (2) properly detain and/or deport Serrano-Vitorino; (3) properly inform law enforcement authorities about the need to detain and/or deport Serrano-Vitorino; (4) fax the 2016 detention order for Serrano-Vitorino to the correct local law-enforcement agency; (5) keep Serrano-Vitorino out of the United States following his original deportation; (6) have policies in place to protect United States citizens, particularly Plaintiffs' decedents, from this type of attack by an illegal immigrant who had been in custody; (7) warn that Serrano-Vitorino was a dangerous and violent convicted felon living among us; (8) prevent Serrano-Vitorino from obtaining a firearm; and (10) take custody of Serrano-Vitorino as required.[33]

---

[31] In *Harter*, Plaintiffs' Complaint named the United States, John Does 1–10, and Pablo Serrano-Vitorino as defendants.  On October 23, 2017, Plaintiffs filed a Notice of Dismissal of Pablo Serrano-Vitorino (Doc. 15), stating that they intended to proceed with their claims against the remaining defendants only.  In *Ryerson*, Plaintiff's Complaint names the United States and John Does 1–10.  While Plaintiffs name "John Does 1-10," and allege in the opening paragraphs of their complaints that these unidentified ICE employees committed "unconstitutional and/or negligent acts and/or omissions" (Doc. 1, ¶¶ 1–2; Doc. 1, ¶ 1 (*Ryerson*)), Plaintiffs have not identified any such individuals by name, nor do Plaintiffs' complaints allege any facts supporting a *Bivens* action against ICE employees for constitutional violations.  *See Watson v. Hollingsworth*, ---F. App'x ---, 2018 WL 3301445, at *4 (10th Cir. July 5, 2018) ("A *Bivens* action provides a 'private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'") (quoting *Ashcroft*, 556 U.S. at 675).

[32] Doc. 1, ¶¶ 27–51; Doc. 1, ¶¶ 29–53 (*Ryerson*).

[33] Doc. 1, ¶ 27; Doc. 1, ¶ 29 (*Ryerson*).

Plaintiffs assert that the foregoing alleged wrongful acts and/or omissions

> were not the result of the exercise of discretion vested in the ICE
> officer, official, agent and/or employee as he/she does not have the
> discretion to decide whether or not to respond to an ICE query, or
> whether or not they should notify the proper authorities having
> custody of an undocumented illegal immigrant or to disregard
> mandatory duties defined by federal statutes and agency rules.[34]

Specifically, Plaintiffs allege that ICE "had a mandatory duty to affirmatively detain and/or

deport Serrano-Vitorino, a convicted felon, pursuant to 8 U.S.C. § 1226(c)(1) and/or 8 U.S.C. §

1357(a)(4)."[35]

---

[34] Doc. 1, ¶ 31; Doc. 1, ¶ 36 (*Ryerson*).

[35] Doc. 1, ¶ 39; Doc. 1, ¶ 42 (*Ryerson*). Section 1226(c)(1) provides:

> The Attorney General shall take into custody any alien who—
>
> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
>
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

Section 1357(a)(4) provides:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant— . . . to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States.

## III.  Analysis

In its motion to dismiss, the United States argues that this Court lacks subject matter jurisdiction to hear Plaintiffs' claims because ICE's alleged failure to adhere to federal immigration statutes is not actionable under the FTCA, which only waives the United States' sovereign immunity for legal duties defined under state law.  The government further argues that even if the FTCA permitted a cause of action for failure to perform federal statutory duties, this Court would still lack subject matter jurisdiction because "ICE's decisions regarding whether and how to detain or remove Serrano-Vitorino from the United States falls within its prosecutorial discretion, which is protected under the discretionary function exception provision of the FTCA found at 28 U.S.C. § 2680(a)."[36]

Under the doctrine of sovereign immunity, the United States "'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"[37]  A court's analysis of claims against the United States therefore begins with the question of whether the government has waived its sovereign immunity for those claims.[38]  The FTCA "provides a limited waiver of the federal government's sovereign immunity,"[39] extending to "actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their

---

[36] Doc. 14 at 1–2; Doc. 24 at 2.

[37] *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)) (ellipses in original); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)) ("The concept of sovereign immunity means that the United States cannot be sued without its consent. . . .  Further, only Congress, not the courts, can waive the sovereign immunity of the United States.  Therefore, '[i]n the absence of clear congressional consent, then, there is no jurisdiction . . . to entertain suits against the United States.'") (internal and final citations omitted).

[38] *Steinle v. City and Cty. of San Francisco*, 230 F. Supp. 3d 994, 1025 (N.D. Cal. 2017) (citing *Testan*, 424 U.S. at 399).

[39] *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997).

employment."[40]  More specifically, the FTCA allows civil claims against the United States for injuries

> caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred*.[41]

The FTCA's waiver of sovereign immunity "does not apply 'where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs.'"[42]  Rather, the waiver of sovereign immunity is limited to "conduct for which a private person could be held liable under state tort law."[43]  "Even if specific behavior is statutorily required of a federal employee, the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons."[44]  "A plaintiff wishing to invoke a waiver of sovereign immunity bears the burden of proving that the statute's waiver applies to [his] particular claims.  Otherwise, the FTCA bars the court from exerting subject matter jurisdiction."[45]

---

[40] *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)).

[41] 28 U.S.C. § 1346(b)(1) (emphasis added).

[42] *United States v. Agronics Inc.*, 164 F.3d 1343, 1345 (10th Cir. 1999) (quoting *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 536 (1st Cir. 1997)) (alteration in original).

[43] *Id.* at 1346 (citing 28 U.S.C. §§ 1346(b)(1), 2674); *see also Klepper v. City of Milford*, 825 F.2d 1440, 1448 (10th Cir. 1987) ("It is well established that where a negligence claim is based on a violation of a federal statute or regulation, no claim will lie under the FTCA in the absence of some other duty under the applicable state law.").

[44] *Ayala v. United States*, 49 F.3d 607, 610 (10th Cir. 1995) (citing *Zabala Clemente v. United States*, 567 F.2d 1140, 1149 (1st Cir. 1997), *cert. denied*, 435 U.S. 1006 (1978)).

[45] *Saunders v. United States*, Civil Action No. 15-cv-00805-RM-CBS, 2016 WL 870011, at *2 (D. Colo. Feb. 16, 2016), *adopted by Saunders v. United States*, Civil Action No. 15-cv-00805-RM-CBS, 2016 WL 865847 (D. Colo. Mar. 7, 2016) (citing *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992)) (internal citation omitted).

In determining whether the United States can be held liable under state tort law, "[t]he Court must apply 'the law of the place where the act or omission complained of occurred.'"[46] The parties agree that the ICE conduct at issue took place in Kansas, and Plaintiffs contend that ICE breached a duty owed to their decedents under Kansas common-law negligence principles. Thus, to meet their burden of proving that the FTCA's waiver of sovereign immunity applies to their claims, Plaintiffs must establish that ICE can be held liable in the same manner as a private person under Kansas negligence law. "If there is no analogous private liability under Kansas law, then this Court lacks subject matter jurisdiction over [P]laintiff[s'] . . . claims under the FTCA."[47]

Under Kansas law, "a negligence claim requires: (1) the existence of a duty; (2) breach of that duty; (3) injury; and (4) a causal connection between the duty breached and the injury sustained."[48] "'Whether a duty exists is a question of law.'"[49]

Plaintiffs argue that ICE can be held liable in the same manner as a private person under Kansas law for its handling of Serrano-Vitorino because Kansas recognizes a common-law claim for the negligent release of dangerous individuals with violent propensities. Plaintiffs rely on *Durflinger v. Artiles*,[50] as well as *Boulanger v. Pol*,[51] two cases involving mentally ill patients who injured others after being released from treatment.

---

[46] *Bowling v. United States*, 740 F. Supp. 2d 1240, 1249 (D. Kan. 2010) (quoting 28 U.S.C. § 2674; *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994)).

[47] *Id*. (citations omitted).

[48] *Kaminski v. United States*, 218 F. Supp. 3d 1251, 1260 (D. Kan. 2016) (citing *Smith v. Kan. Gas Serv. Co*., 169 P.3d 1052, 1057 (2007)).

[49] *Hesler v. Osawatomie State Hosp*., 971 P.2d 1169, 1174 (Kan. 1999) (quoting *Nero v. Kan. State Univ*., 861 P.2d 768 (1993)).

[50] 673 P.2d 86 (Kan. 1983), *disapproved of by Boulanger v. Pol*, 900 P.2d 823, 830 (Kan. 1995).

[51] 900 P.2d 823 (Kan. 1995).

In *Durflinger*, a young man planned to kill his grandparents, but the attack was averted and the following day, his grandfather filed a petition to have him involuntarily committed on the grounds that he was a danger to himself and others. He was committed to Larned State Hospital, diagnosed with passive-aggressive personality disorder with sociopathic tendencies, and released three months later. Shortly thereafter, he killed his mother and brother.[52] The *Durflinger* victims' family members brought a wrongful-death action in this court alleging that the hospital physicians were liable for the negligent release of their patient. After a jury verdict in the plaintiffs' favor, the defendants appealed, and the Tenth Circuit certified a question to the Kansas Supreme Court concerning the validity of a cause of action for the "negligent release of a patient who had violent propensities, from a state institution, as distinguished from negligent failure to warn persons who might be injured by the patient as the result of the release."[53]

The Kansas Supreme Court held that the plaintiffs could state a valid cause of action against a physician for the negligent release of a patient with violent propensities.[54] The court reasoned that the "general rules of negligence and medical malpractice"[55] apply to an action for the negligent release of a patient, because physicians are "obligated to [their] patient[s] under the law to use reasonable and ordinary care and diligence in the treatment of cases…"[56] Further, the court found that the decision to recommend the discharge of a mentally ill person as someone no longer in need of treatment is part of the professional duty of physicians and is a duty exercised for the benefit of patient and public.[57]

---

[52] *Durflinger*, 673 P.2d at 90.

[53] *Id*. at 91.

[54] *Id*. at 99–100.

[55] *Id*. at 99.

[56] *Id*. at 92 (quoting *Malone v. Univ. of Kan. Med. Ctr.*, 552 P.2d 885 (Kan. 1976)).

[57] *Id*. at 94.

Having recognized a valid cause of action for the negligent release of a patient with violent propensities, the court went on to distinguish negligent release from other third-party actions. The court stated:

> In these other actions liability is not predicated upon the inherent duty of the physician in the ordinary course of treatment of his patient, but rather that a special relationship existed which required the physician to take some *affirmative* action outside the regular course of treatment to protect third persons. Such affirmative actions are for the benefit of third parties, not the patient, and involve such steps as notifying a potential victim, calling the police or instituting commitment proceedings.[58]

Quoting extensively from cases from other jurisdictions concerning duties arising from the physician-patient relationship, the court noted that "[i]n order to impose a duty to take affirmative action for the protection of third persons, the courts [in those cases] adopted the Restatement (Second) of Torts § 315 (1965) and found a special relationship existed which required action to be taken for the benefit of a third person."[59] But the court found that with respect to negligent-release claims, "there is no reason to apply the concept of special relationship and the resulting affirmative duty to take some special step to protect a third party or the public."[60]

In *Boulanger*, however, the Kansas Supreme Court retreated from its language in *Durflinger* that a cause of action for negligent release of a mentally ill patient is one of medical malpractice.[61] In *Boulanger*, the patient had been voluntarily committed for violent and suicidal

---

[58] *Id*. (emphasis in original).

[59] *Id*. (referring to *Lipari v. Sears, Roebuck & Co*., 497 F. Supp. 185 (D. Neb. 1980); *Tarasoff v. Regents of the Univ. of Cal*., 551 P.2d 334 (Cal. 1976)).

[60] *Id.* at 99.

[61] *Boulanger v. Pol*, 900 P.2d 823, 830 (Kan. 1995).

tendencies, and upon release, shot his uncle, who then sued the treatment facility.[62]  The Kansas

Supreme Court noted:

> While the [*Durflinger*] court discussed the duty a physician owes to
> his patient under general negligence principles, the source of the
> duty owed to the public for negligently releasing a patient was the
> involuntary commitment statutes.  No determination of whether a
> patient is dangerous to himself or herself or others is required to be
> made upon either admission or discharge of a voluntary patient.  Nor
> is a physician statutorily required to seek commitment of a voluntary
> patient who requests discharge.  A physician does not have a duty to
> a third party for the negligent release of a voluntary patient under
> the rule announced in *Durflinger*.[63]

Thus, the court examined whether the defendant had a duty to control the patient's conduct or a

duty to warn the uncle by virtue of the special relationship doctrine set forth in Restatement §

315.  That Restatement section provides:

> There is no duty so to control the conduct of a third person as to
> prevent him from causing physical harm to another unless
>
> (a)      a special relation exists between the actor and the third
> person which imposes a duty upon the actor to control the third
> person's conduct, or
>
> (b)      a special relation exists between the actor and the other
> which gives to the other a right to protection.[64]

Because the plaintiff did not allege a special relationship between he and the defendants,

as §315(b) requires, the court focused on whether there was a special relationship between the

mentally ill patient and the defendants as §315(a) requires.[65]  The court noted that § 315(a) is

governed by Restatement (Second) of Torts § 319, which provides: "One who takes charge of a

---

[62] *Id.* at 825–26.

[63] *Id*. at 831.

[64] Restatement (Second) of Torts § 315 (Am. Law Inst. 1965).

[65] *Boulanger*, 900 P.2d at 833.

third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."[66]   The court further noted that "Kansas courts have recognized an affirmative duty to protect third persons from harm based on the special relationship doctrine set forth in § 315."[67]  But, the application of the doctrine is "fact specific."[68]  Although it assumed without deciding that § 315 might be applicable under certain circumstances to the relationship between a psychiatrist and a voluntary patient,[69] the court held that the facts in *Boulanger* did not support the existence of a duty to warn the plaintiff because he was already aware of his nephew's violent tendencies, nor did the facts support an affirmative duty to control the patient because the "defendants did not have the requisite control of [the patient] which might conceivably create a duty under § 319."[70]

In addition to relying on *Durflinger* and *Boulanger*, Plaintiffs argue that Kansas courts have cited the Restatement in numerous other cases in support of findings of "special relations giving rise to the duty to aid or protect."[71]  As stated in a host of Kansas cases, "[i]t is [the] generally recognized rule in Kansas that in the absence of a 'special relationship' there is no duty

---

[66] *Id*. (quoting RESTATEMENT (SECOND) OF TORTS § 319 (AM. LAW INST. 1965)).  The general principle stated in § 315 is applied by reference to other Restatement sections.  More specifically, the § 315(a) special relationships between an actor and a third person which impose a duty upon the actor to control the third person's conduct are stated in § 316 (duty of parent to control conduct of child), § 317 (duty of master to control conduct of his or her servant), § 318 (duty of possessor of land or chattels to control conduct of licensee), and § 319 (duty of those in charge of persons having dangerous propensities).  The § 315(b) special relationships between an actor and another which give to the other a right to protection are stated in § 314A (special relations giving rise to duty to aid or protect) and § 320 (duty of person having custody of another to control conduct of third persons).  *Nero v. Kan. State Univ.*, 861 P.2d 768, 773 (Kan. 1993) (citing RESTATEMENT (SECOND) OF TORTS § 315, Comment c); *Adams v. Bd. of Sedgwick Cty. Comm'rs*, 214 P.3d 1173, 1184 (Kan. 2009) (same).

[67] *Boulanger*, 900 P.2d at 833 (citations omitted).

[68] *Id.* at 834.

[69] *Id*.

[70] *Id*. at 835.

[71] Doc. 25 at 9.

on a person to control the conduct of a third person to prevent harm to others."[72]  But Kansas courts have found a special relationship giving rise to a duty to aid or protect in cases involving common carriers, land possessors, and innkeepers pursuant to Restatement (Second) of Torts § 314A, which concerns certain "special relations giving rise to a duty to aid or protect" that arise under § 315(b).[73]  Section 314A states:

> (1)  A common carrier is under a duty to its passengers to take reasonable action
>
>> (a)  to protect them against unreasonable risk of physical harm, and
>>
>> (b)  to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2)  An innkeeper is under a similar duty to his guests.
>
> (3)  A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
>
> (4)  One who is required by law or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Although "[t]he Kansas Supreme Court has regularly relied upon the Restatement (Second) of Torts for authoritative guidance in fashioning controlling doctrine on the scope of

---

[72] *Gragg v. Wichita State Univ.*, 934 P.2d 121, 128 (Kan. 1997); *see also, e.g., South ex rel. South v. McCarter*, 119 P.3d 1, 8 (Kan. 2005) (citing *D.W. v. Bliss*, 112 P.3d 232 (Kan. 2005)); *Kirk v. City of Shawnee*, 10 P.3d 27, 31 (Kan. Ct. App. 2000) (citing *Schmidt v. HTG, Inc.*, 961 P.2d 677, 689 (Kan. 1998), *cert. denied* 525 U.S. 964 (1998)); *McGee by and through McGee v. Chalfant*, 806 P.2d 980, 983 (Kan. 1991) (citing *Thies v. Cooper*, 753 P.2d 1280 (Kan. 1988); RESTATEMENT (SECOND) OF TORTS § 315 (AM LAW INST. 1964)).

[73] *See, e.g., Adams v. Bd. of Sedgwick Cty. Comm'rs*, 214 P.3d 1173, 1184 (Kan. 2009) ("those [duties] which arise because of a relationship between the actor and another that require 'require the actor to control the conduct of third person for the protection of the other are stated in §§ 314A and 320'") (quoting RESTATEMENT (SECOND) OF TORTS § 315, Comment c).
.

17

duty, negligence, and related liability issues when a plaintiff alleges a special relationship,"[74] the Court finds the opinions and Restatement provisions cited by Plaintiffs inapposite and insufficient to establish a duty under Kansas tort law in this case.

Plaintiffs have failed to allege facts sufficient to establish any such special relationship under Kansas law between ICE and Serrano-Vitorino. While Kansas courts have applied §§ 315 and 319 when considering the existence of a duty, "[t]he Kansas cases applying these sections require real control that would allow the prevention of the harm that gives rise to the lawsuit."[75] In this case, ICE had no relationship with Serrano-Vitorino approximating that between a physician and patient, nor did ICE have physical custody or control of Serrano-Vitorino at any time after he was deported following his 2003 conviction. ICE did not have custody or control of Serrano-Vitorino analogous to the custody and control that the treatment providers had over the involuntarily committed patient in *Durflinger*. Indeed, there is no Kansas statute comparable to the Kansas involuntary commitment statue that requires ICE to detain undocumented aliens. Nor did ICE have some semblance of custody or control of Serrano-Vitorino analogous to the

---

[74] *Estate of Belden v. Brown Cty.*, 261 P.3d 943, 962 (Kan. Ct. App. 2011) (citations omitted).

[75] *Adams*, 214 P.3d at 1189 (holding that "an outpatient mental health treatment facility does not take charge of a patient subject to an order for outpatient therapy in a manner that gives rise to a duty to control the patient's conduct or to give rise to a special relationship with others who come in contact with the patient"); *see also, e.g.*, *Schmidt*, 961 P.2d at 687 (holding that parole officer did not "take charge or exercise control over a parolee within the meaning of § 319"); *Calwell v. Hassan*, 925 P.2d 422, 430 (Kan. 1996) ("We have imposed a § 315 duty only in situations involving a dangerous person in a custodial setting."); *C.J.W. By and Through L.W. v. State*, 853 P.2d 4, 12 (Kan. 1993) (concluding that under Restatement §§ 315, 319, and 320, State had duty to take reasonable steps to protect 12-year-old confined in juvenile detention center from older fellow inmate with known propensity for sexual violence and to warn juvenile hall officials of older inmate's violent propensities); *Cansler v. State*, 675 P.2d 57, 66 (Kan. 1984) (adopting § 319 "as the law of this state governing the duty of those in charge of persons having dangerous propensities" in case against State for injuries suffered by city police officer shot by convicted murderers who gained access to high-powered weapons and escaped while in custody and under State's control at State penitentiary); *Keiswetter ex rel. Estate of Keiswetter v. State*, 329 P.3d 557 (Table), 2014 WL 3732021, at *5 (Kan. Ct. App. July 25, 2014) ("[I]t is important to recognize that in *Schmidt v. HTG, Inc.*, 265 Kan. 372, 386, 961 P.2d 677 (1998), the Kansas Supreme Court rejected a construction of Restatement (Second) of Torts § 319 that would escalate 'the State's responsibility to that of the virtual guarantor of the safety of each and every one of its citizens from illegal and unlawful actions of every . . . person released from custody under any type or kind of supervision.'") (ellipses in original).

semblance of custody that the treatment providers had over the voluntarily committed patient in *Boulanger*.

The *Durflinger* and *Boulanger* cases thus provide no analog to find a special relationship between ICE and Serrano-Vitorino. Indeed, Plaintiffs concede that they consider the source of the special relationship as emanating from federal immigration law, specifically provisions of the Immigration and Naturalization Act.[76] At oral argument, Plaintiffs' counsel stated that "[a]t its core, [P]laintiffs' complaint argues that ICE employees failed to respond to the appropriate law enforcement agency *as required by their federal job*,"[77] and that "any reference to *federal statutes* is done in furtherance of establishing the scope of employment, *the existence of a duty, the functions of an agent of the United States, specifically employees of Immigration and Customs Enforcement*."[78] The duty Plaintiffs allege arises from federal law—specifically, ICE's responsibility under 8 U.S.C. § 1226(c)(1) and/or 8 U.S.C. § 1357(a) to detain and deport criminal aliens—which is a duty that private citizens do not bear under Kansas tort law.

Moreover, Plaintiffs have failed to allege facts sufficient to establish any special relationship between ICE and the victims giving rise to a duty by ICE to detain, deport, warn, or protect. The common carrier cases cited by Plaintiffs and Restatement § 314A are unpersuasive. Under these authorities, the special relationship and corresponding duty arise by virtue of the plaintiff being an invited guest or patron on the defendant's property or in the defendant's custody.[79] Plaintiffs' decedents were never in such a relationship to ICE. They were not guests,

---

[76] Mtn. Hrg. Tr., Doc. 31 at 38:11–40:3.

[77] *Id*. at 27:8–10 (emphasis added).

[78] *Id*. at 27:22–28:1 (emphasis added); *see also* Doc. 16 at 5 (arguing that "these [federal] statutes establish . . . the existence of a duty, as required by Kansas common law"); Doc. 25 at 7 (same).

[79] *See, e.g.*, *Watters v. Kan. Dept. for Children and Families*, No. 112,415, 2015 WL 9456744 (Table), at *9 (Kan. Ct. App. Dec. 23, 2015) (citation omitted) ("Restatement (Second) of Torts § 314A (1965) identifies four kinds of special relationships that create exceptions to the general rule that an actor has no duty to help another person:

invitees, licensees, passengers, nor people who had entered into some other transaction or relationship giving rise to a duty by ICE to protect them. Rather, Plaintiffs' decedents were members of the public at large, and Plaintiffs do not allege any specific facts that might establish a special relationship between ICE and Plaintiffs' decedents under Kansas tort law.[80] Nor do Plaintiffs allege facts establishing that ICE was aware of a specific threat to Plaintiffs' decedents, and the Kansas Supreme Court has found that even where a special relationship gives rise to a duty to control, there is no duty to warn third persons in the absence of a specific threat of harm.[81,82]

---

common carriers, innkeepers, landowners, and custodians owe a duty to aid their passengers, guests, invitees, and people in custody."); *D.W. v. Bliss*, 112 P.3d 232, 241 (Kan. 2005) ("[W]e recognize there is a special relationship between possessors of land and their licensees that may lead to premises liability.") (citing *Jones v. Hansen*, 867 P.2d 303 (Kan. 1994); *Nero v. Kan. State Univ.*, 861 P.2d 768 (Kan. 1993)); *Gardin v. Emporia Hotels, Inc.*, 61 P.3d 732, 736 (Kan. 2003) ("Generally speaking, a person has no duty to control the conduct of a third person to prevent harm to others unless there is a 'special relationship' between the parties. This may not be as humane a policy as we might like to see, but it is the law. One such 'special relationship' exists between an innkeeper and its guests.") (internal citations omitted); *Thomas v. Cty. Comm'rs of Shawnee Cty.*, 262 P.3d 336, 348 (Kan. 2011) (holding that under § 314A(4), defendant jailers had duty to protect prisoner "against unreasonable risk of harm, including risk arising out of his own conduct."); *Estate of Belden,* 261 P.3d at 962 ("Jails and other penal institutions . . . stand in a special relationship with the persons they detain as outlined in . . . Restatement (Second) of Torts § 314A. And having taken legal custody of those prisoners in a manner that 'deprive[s]' them of 'normal opportunities for protection,' such an institution 'is under a duty to . . . take reasonable action to protect them against unreasonable risk of physical harm.'") (quoting RESTATEMENT (SECOND) OF TORTS § 314A (AM. LAW INST. 1965)).

[80] *See, e.g., Keiswetter*, 2014 WL 3732021, at *5 (holding that State did not owe duty to woman injured by inmate who escaped from work detail because "no special relationship existed under the undisputed facts of this case that would create a special duty owed by the State to protect [her] that is different from its duty to the public at large"); *P.W. v. Kan. Dept. of Soc. and Rehab. Servs.*, 877 P.2d 430, 433–35 (Kan. 1994) (finding no special relationship between state agencies and children who were abused while attending state-licensed daycare where children were "never in the legal or physical custody or care" of the agencies and agencies "had no more contact with the plaintiffs than with any other member of the public at large"); *Robertson v. City of Topeka*, 644 P.2d 458, 463 (Kan. 1982) ("Actionable negligence must be based on a duty owed the plaintiff by the defendant. It is generally held that the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large, not to a particular individual. Absent some special relationship with or specific duty owed to an individual, liability will not lie for damages.") (internal and final citations omitted).

[81] *See, e.g., Hesler v. Osawatomie State Hosp.*, 971 P.2d 1169, 1178 (Kan. 1999) (finding that even where special relationship creates a duty to control, the question of whether that duty includes the duty to warn potential victims remains, and there exists no duty to warn in the absence of an express threat); *Schmidt v. HTG, Inc.*, 961 P.2d 677, 689 (Kan. 1998), *cert. denied* 525 U.S. 964 (1998) (finding, in case involving murder of restaurant worker by coworker conditionally released from prison, that parole officer had no common-law duty to warn third parties of parolee's dangerous propensities "in the absence of an express threat.").

[82] At the hearing, Plaintiffs' counsel referred to the Restatement concept of a duty arising out of the "negligent performance of [an] undertaking to render services." Doc. 31 at 22:21–23. Plaintiffs neither briefed this concept

The authorities Plaintiffs cite do not support the state-law duty they seek to impose in this case, which is the duty of a private person to detain or control the conduct of a third person with whom he has no special relationship, and/or to aid, protect, or warn another with whom he also has no special relationship. Because the FTCA's waiver of sovereign immunity extends only to conduct for which a private person could be held liable under state tort law, this Court lacks subject matter jurisdiction to hear Plaintiffs' claims. The Court therefore does not reach the question of whether Plaintiffs' claims are barred by the discretionary function exception to the FTCA.[83]

**IT IS THEREFORE ORDERED BY THE COURT** that the United States' Motions to Dismiss (Docs. 13 and 23) are **GRANTED**.

**IT IS SO ORDERED.**

Dated: September 26, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

nor referenced its exact source at the hearing, and the Court is not inclined to speculate upon nor address arguments raised in a perfunctory manner. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002).

[83] *Bowling v. United States*, 740 F. Supp. 2d 1240, 1249 (D. Kan. 2010) (citing *Sheridan v. United States*, 487 U.S. 382, 400 (1988)) ("A court must first decide whether plaintiff's claims come within the limited waiver of immunity set forth in § 1346(b) before proceeding to the exclusions and exceptions in § 2680.").